**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA

v.

VEER CHETAL,

    Defendant.

---

Criminal Action No. 24-494 (CKK)

**UNDER SEAL**

**MEMORANDUM OPINION & ORDER**
(April 3, 2025)

On March 5, 2025, the Court ordered that Defendant Veer Chetal be detained pending sentencing. *See* Mem. Op. & Order, ECF No. 29. Chetal moved for reconsideration of that order, and on April 2, 2025, the Court held a hearing on his motion. Having considered Chetal's motion, the parties' oral presentations, and the testimony of Chetal's parents, the Court **DENIES** Chetal's [30] Motion in Support of Readmission to Pretrial Release without prejudice. The Court reaches that conclusion on the present record and recognizes that circumstances may change in the future.

**I. BACKGROUND**

On November 13, 2024, Chetal pleaded guilty to a two-count [2] Information charging him with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349; and Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h). *See* Plea Agreement, ECF No. 9. After accepting Chetal's guilty plea, the Court ordered Chetal released pending sentencing under conditions of release. Order Setting Conditions of Release, ECF No. 12 ("Release Order"). Among other things, the Release Order required that Chetal surrender his passport to the Pretrial Services Agency. *Id.* at 2. The Release Order, which Chetal signed, further advised him that failure to comply with his release conditions "may result in the immediate issuance of a warrant for [his] arrest, [and] a revocation of [his] release." *Id.* at 4.

1

Case 1:24-cr-00494-CKK     Document 32     Filed 04/03/25     Page 2 of 9

On January 24, 2025, the Government filed an *ex parte* Motion for Revocation of Release and Request that the Court Issue a Bench Warrant. ECF No. 13 ("Gov't's Mot."). That motion informed the Court of three important developments. First, the Government alleged that Chetal engaged in additional, undisclosed criminal conduct during his plea negotiations with the Government. *Id.* at 8–12. Second, the Government informed the Court that Chetal had not surrendered his passport to Pretrial Services as ordered. *Id.* at 12. Third, the Government informed the Court that Chetal—who is not a U.S. citizen—had dropped out of college; that Chetal's father had lost his work visa; that, according to law-enforcement sources, Chetal had discussed travelling to a country with favorable extradition laws; and that Chetal had told the Government he planned to travel to India. *Id.* The Government requested that the Court issue a warrant for Chetal's arrest.

Later on January 24, and relying on the Government's representations, the Court issued a sealed, *ex parte* order granting the Government's motion. Order, ECF No. 14. The Court ordered that a warrant for Chetal's arrest be issued and executed; that Chetal be temporarily detained under 18 U.S.C. § 3142(d) following his arrest; and that Chetal be transferred to the District of Columbia for a hearing on the revocation of his release. *Id.* at 1–2.[1]

On March 4, 2025, Chetal and the Government appeared before the Court. *See* Mem. Op. & Order at 3. The Government orally moved for revocation of Chetal's release under 18 U.S.C. § 3148(b), and the Court held a hearing on that oral motion. *Id.* Based on the parties' oral presentations and Chetal's concessions, the Court concluded that Chetal had violated a condition of his release by not surrendering his passport and that no conditions of release could ensure that Chetal would not flee if he remained on release. *See id.* at 4. Accordingly, the Court orally ordered that Chetal be detained and later issued a Memorandum Opinion explaining that order. *See id.*

---

[1] Under 18 U.S.C. § 3142(d), the Court "shall order" the temporary detention of a person on "release pending imposition or execution of a sentence" who "may flee or pose a danger to the community."

On March 31, Chetal moved for reconsideration of the Court's oral order. Def.'s Mot., ECF No. 30. In a Joint Status Report filed the next day, the Government expressed that it opposed Chetal's release and would rely on its earlier *ex parte* motion to oppose reconsideration. ECF No. 31 at 1. On April 2, the Court held a hearing on Chetal's motion with all parties present. Chetal and the Government gave oral presentations in support of their respective positions. And the Court heard testimony from Chetal's parents, who would supervise Chetal in the event of his release. The Court then took the matter under advisement.

## II. LEGAL STANDARD

Following a guilty plea, and subject to exceptions not relevant here, a defendant "who is awaiting imposition or execution of a sentence" must be "detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger" to the community. 18 U.S.C. § 3143(a). On such a finding, the Court "shall order the release of the person" subject to conditions of release. *Id.* That is what occurred here: Following his guilty plea, Chetal was ordered released subject to conditions. *See* Release Order.

But an individual on release pending sentencing "is subject to a revocation of release" and "an order of detention" if he violates a condition of his release. 18 U.S.C. § 3148(a). The Court "shall enter an order of revocation and detention" if, after a hearing, the Court:

(1) finds that there is—

    (A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; or

    (B) clear and convincing evidence that the person has violated any other condition of release; and

(2) finds that—

    (A) based on the factors set forth in section 3142(g) of [Title 18], there is no condition or combination of conditions of release that will assure

3

> that the person will not flee or pose a danger to the safety of any other
> person or the community; or
>
> (B) the person is unlikely to abide by any condition or combination of
> conditions of release.

*Id.* § 3148(b). Again, that is what occurred here: The Court ordered Chetal detained after it found

that Chetal violated a condition of release and that he was a flight risk. *See* Mem. Op., ECF No. 29.

Because Chetal seeks reconsideration of the Court's revocation of release under Section

3148(b)—not an initial order of detention pending sentencing under Section 3143(a)—the Court

assesses his motion under the Section 3148(b) standard.

## III. ANALYSIS

### A. Chetal Violated a Condition of His Release.

Chetal "does not deny" that he did not surrender his passport to Pretrial Services as ordered.

Def.'s Mot. at 7. That concession, in tandem with the Government's proffer, is sufficient for the

Court to conclude by clear and convincing evidence that Chetal violated a condition of his release

pending sentencing. *See* 18 U.S.C. § 3148(b)(1)(B).

### B. Chetal Is a Flight Risk.

The crux of the parties' dispute is whether "based on the factors set forth in section 3142(g)

of [Title 18], there is no condition or combination of conditions of release that will assure that the

person will not flee or pose a danger to the safety of any other person or the community." 18

U.S.C. § 3148(b)(2)(A). The Court and the parties have focused particularly on the risk that Chetal

will flee. Although the statute is silent as to the level of proof required to establish risk of flight,

the U.S. Court of Appeals for the District of Columbia Circuit has held that such a finding need

only be supported by a preponderance of the evidence. *United States v. Simpkins*, 826 F.2d 94, 96

(D.C. Cir. 1987). Here, a preponderance of the evidence establishes that Chetal is a flight risk.

*First,* the nature and circumstances of the offense charged support detention. *See* 18 U.S.C. § 3142(g)(1). Chetal pleaded guilty to participating in a sophisticated digital fraud involving cryptocurrency. The inherently covert nature of this crime creates a risk that future frauds will go undetected. And Chetal faces a sentence with a Guidelines range of 235 to 293 months, creating a significant incentive to flee before sentencing. *See* Gov't's Mot. at 14.

*Second,* the weight of the evidence against Chetal strongly supports detention. *See* 18 U.S.C. § 3142(g)(2). Chetal has already pleaded guilty to the Information.

*Third,* Chetal's history and characteristics support detention. *See* 18 U.S.C. § 3142(g)(3). Although Chetal has lived in the United States since he was child, he has few concrete ties to any community. He is unemployed. He has no spouse or children. He is no longer enrolled in school. And his parents are selling their home in Connecticut, where Chetal lived when he committed the offenses to which he has pleaded guilty.

Chetal's immigration status creates further incentives to flee rather than remain in the United States. Chetal is an Indian citizen and, until recently, lived in the United States as an H4 dependent to his father's H1B visa. Def.'s Mot. a 2. But, apparently due in part to Chetal's criminal conduct, Chetal's father lost his job and, in turn, his H1B visa. *Id.* at 3. Chetal and his family then transitioned to B2 (tourist) visas, which expire in June 2025. *Id.* at 4. Because Chetal's parents were the victims of a crime, the U.S. Attorney's Office for the District of Connecticut is supporting their application for a U visa. *Id.* at 5. But Chetal himself is ineligible for a U visa because of his guilty plea in this case. *Id.* So, at present, Chetal is authorized to remain in the country until June only. And based on counsel's representations during the hearing, Chetal's prospect of securing a more permanent immigration status pending sentencing for serious fraud

charges is uncertain at best. Faced with the choice between fleeing the country or serving a sentence and then being deported anyway, Chetal has a serious incentive to flee.

Indeed, Chetal admits that he has already taken steps to leave the country, notwithstanding the fact that he was ordered not to do so. When Chetal transitioned to a B2 visa, he was forced to drop out of college. Def.'s Mot. at 4. Intending to "continue his study abroad," Chetal and his father "began to explore college options in India and Dubai." *Id.* And Chetal—without consulting either the Court or the Government—determined he would enroll in a college in India, prepared to take an exam necessary for such enrollment, and retained his passport to facilitate that test-taking. *Id.* at 4–5. Chetal maintains that he planned to hand over his passport after taking the entrance exam and would have enrolled only if "authorized . . . by the Court and the government." *Id.* But Chetal knew that, regardless of his cooperation, he would likely face *some* period of detention. So his avowed plan to "begin his studies in September of 2025" appears inconsistent with this explanation. *Id.* at 4.

Further, Chetal's history of duplicity leaves the Court with serious doubts about the likelihood that he would keep to his word. Chetal admits to participating in a series of frauds involving impersonation and lies. Chetal admits that he continued to participate—at least at the periphery—in such frauds during his plea negotiations with the Government. Chetal admits that he did not disclose that additional conduct to the Government. Chetal admits that, after his guilty plea, he was contacted by his co-conspirators about still more criminal conduct and that, in contravention of his agreement with the Government, he failed to disclose those communications. The Court is wary of placing its trust in Chetal again after he has already abused that trust.

Chetal does not deny this history. His counsel ably and credibly argued that Chetal is a young person with poor judgment who now understands that he made mistakes in the past. But

Chetal's youth and poor judgment are a double-edged sword. Those traits mute, at least to some degree, the severity of Chetal's past behavior. But a young person with a habit of making bad decisions and a serious incentive to flee the country does not inspire confidence.

*Fourth,* "the nature and seriousness of the danger to any person or the community that would be posed by [Chetal's] release" support detention. *See* 18 U.S.C. § 3142(g)(4). Chetal has no evident history of violence or access to weapons. But he admits to engaging in a course of criminal conduct over an extended period of time. Chetal also admits to continued participation in, and undisclosed knowledge of, such conduct since he began cooperating with the Government. And Chetal's release creates a risk that he will further victimize members of the community.

*Finally,* the Court cannot conclude that Chetal's proposed conditions of release will ensure his continued participation in this matter. Chetal proposes a series of conditions, the most relevant of which are that he would subject himself to high-intensity supervision by Pretrial Services while residing in a new home near the District of Columbia with his parents, who would surrender their passports and post a personal surety bond of $100,000. Def.'s Mot. at 9.

Although the Court appreciates Chetal's counsel's efforts in crafting these proposed conditions and does not doubt the sincerity of Chetal's parents, three issues compel the conclusion that these conditions are presently insufficient to ensure Chetal will not flee.

First, on the present record, Chetal's proposed arrangement is fraught with uncertainty. Where will Chetal live? The Court cannot be sure because Chetal's parents are trying to sell their home in Connecticut and, for now, have only relatively vague plans to move somewhere in Virginia. Will Chetal's parents be allowed to stay in the country? The Court cannot be sure because their tourist visas expire in June, their U-visa applications—though supported by the U.S. Attorney's Office in Connecticut—are still being processed, and the duration of those visas—even

if granted—is unclear and may be contingent on the circumstances of a criminal case this Court knows almost nothing about. What will Chetal do while on release? Again, the Court cannot be sure because Chetal has no student visa and no work history. In short, the Court does not know, on the present record, what releasing Chetal would entail.

Second, Chetal has demonstrated an ability to thwart the coercive force of his proposed conditions. Chetal has now surrendered his passport, and his parents have offered to surrender their passports as well. But Chetal and his co-conspirators evidently have ready access to private jets. And the Government proffers that one of Chetal's co-conspirators has boasted that he can arrange jet travel without the need to show identification. Likewise, Chetal's parents' willingness to post a $100,000 personal surety bond would ordinarily weigh heavily in favor of his release. But Chetal admits that, even after he began negotiating with the Government, he secured $200,000 in illicit funds with a simple text message. That sum was so trivial to Chetal that he gambled and lost all $200,000 on a single bet nine minutes later. If Chetal fled, he could resolve his parent's resulting financial hardship with ease.

Third, although the Court does not doubt the sincerity of Chetal's parents' testimony or their love for their son, the Court lacks confidence that releasing Chetal to their supervision will ensure his continued participation in this matter or deter future criminal conduct. Chetal committed virtually all his offense conduct while living at home with his parents. Chetal apparently lied to his parents and concocted a story to explain away that conduct. But cross-examination of Chetal's father revealed that glaring indications of Chetal's criminality went unquestioned. Chetal's parents knew that Chetal, while an unemployed student living at home, frequently went away on trips with friends in private jets, rented multi-million-dollar homes in the Hamptons, and made a series of luxury purchases. Chetal even gifted his parents a Lamborghini.

Chetal's parents also knew that Chetal had a duffel bag full of cash ($500,000 worth) hidden in their laundry machine. And his parents further knew that Chetal—a young man—was receiving plushie children's toys stuffed with something unusual (more cash). In short, releasing Chetal to his parents' custody would mean releasing him into the same environment in which he was able to perpetrate his crimes in the first place.

*        *        *

Taken together, the preponderance of the evidence supports the conclusion that Chetal is a flight risk—even under his proposed conditions. Because clear and convincing evidence shows Chetal already violated a condition of his release, the Court properly revoked Chetal's Release Order and ordered him detained pending sentencing under 18 U.S.C. § 3148(b). On reconsideration, the Court presently sees no reason to disturb that order.

### III. CONCLUSION & ORDER

In light of the foregoing, and despite Chetal's counsel's compelling oral and written presentations, it is hereby:

**ORDERED** that Chetal's [30] Motion in Support of Readmission to Pretrial Release is **DENIED** without prejudice.

**SO ORDERED.**

**Dated:** April 3, 2025

COLLEEN KOLLAR-KOTELLY
United States District Judge